UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Dennis M Ellis,                                                                Case No. 3:18-cv-244

           Plaintiff,

      v.                                                                  MEMORANDUM OPINION
                                                                                  AND ORDER

C. Timm, et al.,

           Defendants.

## I.     INTRODUCTION

Before me is the motion for summary judgment filed by Defendants Chris Timm, Brian Miller, and Matt Simon. (Doc. No. 29). Plaintiff Dennis M. Ellis filed a motion in opposition, (Doc. No. 39), and Defendants replied. (Doc. No. 40).

## II.     BACKGROUND

On February 24, 2017, Dennis Ellis was placed under arrest by Defendants, all of whom were officers working for the Lake Township Police Department at the time. (Doc. No. 34-1 at 11). Ellis alleges Defendants used excessive force, in violation of federal and state law, to carry out his arrest.

Before his encounter with Defendants that afternoon, Ellis was driving home from a bar when he had an interaction with another driver, Amber Turner. (Doc. No. 34-1 at 11, 13). According to Ellis, Turner was using her phone while she was driving and, as a result, nearly collided with Ellis's vehicle. (*Id.* at 13). Shortly after this, Ellis pulled up alongside Turner's car at an intersection and yelled at her. (*Id.*) Turner then passed him and "gave [him] the finger or something

to irk me off". (*Id.*). Upset by this, Ellis followed Turner into a parking lot near Woodbury Market, where he got out of his car and "gave her a piece of my mind." (*Id.* at 11). The record does not reveal how long this dispute lasted, but according to Ellis it ended when he got tired of arguing with Turner and drove home. (*Id.* at 13).

Sometime after this, Turner called the police to report Ellis. Officer Simon responded to a call from dispatch regarding reckless driving and went to meet with Turner, who was parked in a parking lot across the street from Woodbury Market. (Doc. No. 30-1 at 12). Turner told Simon that Ellis had been "mouthing things" to her as they drove down Woodville Road before following her into the Woodbury Market parking lot. (*Id.* at 11). She also told Simon that Ellis exited his vehicle and approached hers, at which point Turner decided to drive to a parking lot across the street and Ellis returned to his vehicle and drove away. (*Id.* at 11-12).

Simon spoke with Turner for less than five minutes, but during this time he was able to examine a picture of Ellis's license plate taken by a passenger in Turner's vehicle. (*Id.* at 12-13). Simon used the picture to run a license plate check, which provided him with Ellis's home address. (*Id.* at 13). From there, Simon informed dispatch he was heading to that address, and, according to him, arrived there at the same time as Miller and Timm. (*Id.*).[1]

The parties present significantly different stories of what took place during their encounter in Ellis's driveway. While I present the different versions below, for the purposes of deciding Defendants' motion, I must accept Ellis's version of the facts and draw all reasonable inferences in his favor. *Rudolph v. Babinec*, 939 F.3d 742, 746 (6th Cir. 2019).

---

[1] Timm testified he and Miller arrived at Ellis's a minute or two before Simon and began asking Ellis questions. (Doc. No. 32-1 at 6). Although this inconsistency with Simon's and Miller's testimony is somewhat curious, whether all three arrived at once or not is irrelevant to the outcome of Defendants' motion.

According to Ellis: the defendants walked up his driveway on February 24, 2017, sometime in the afternoon, while he and his friend, Mark Spitler, were talking to each other in a fenced-in area of Ellis's property and watching their dogs play. (Doc. No. 34-1 at 11). One of the officers asked Ellis to step outside of this enclosed area and come speak to the officers regarding an incident at Woodbury Market. (*Id.*). Ellis complied with the request and began to present his side of the story concerning his encounter with Turner (*Id.*). But as soon as Ellis left the gated area, one of the officers began screaming at him for scaring Turner. (*Id.*). At the same time, a different officer said they smelled alcohol, and asked Ellis whether he had been drinking and driving, while another officer walked over to Ellis's car and placed his hand on the hood. (*Id.*). Ellis claims he informed the officers he had been to a bar earlier that day and had also just finished drinking a beer. (*Id.*).[2]

One of the officers then asked to see Ellis's driver's license and Ellis retrieved it from his vehicle. (Doc. No. 34-1 at 11). After Ellis did so, an officer took it from him and told him he would be "getting an OVI." (*Id.*).[3] The officers then asked Ellis to take some field sobriety tests, including a breathalyzer test, but Ellis refused. (*Id.*). Ellis testified his refusal made the officers "irate." (*Id.* at 12). At some point after one of the officers took Ellis's license from him, an officer asked him where he worked, and Ellis replied that he did not work because he was on disability for back problems. (*Id.*).

Following all of this, the officers began to place Ellis under arrest. (*Id.*). When asked to place his hands behind his back, Ellis informed the officers he couldn't do so without hurting his back and asked the officers to handcuff him in the front instead. (*Id.*). After Ellis made this request, Timm rushed him, forced one of his hands behind his back, and took him down. (*Id.*). Ellis

---

[2] According to Simon, Ellis mentioned being kicked out of that bar, but Ellis testified he left voluntarily. (Doc. No. 30-1 at 18; Doc. No. 34-1 at 13).
[3] OVI refers to operating a vehicle while under the influence of alcohol or drugs, in violation of Ohio Rev. Code § 4511.19.

3

testified he was "ambushed," and that all of the officers were on top of him as he was laying on the ground. (*Id.* at 15). Once the officers had Ellis's hands cuffed behind his back, they began pulling on his arms and telling him to stand up, which caused Ellis additional pain. (*Id.*) Ellis had trouble complying with their request to stand because his ankle was injured. (*Id.*). Ellis admits that at this point he began screaming at the officers. (*Id.* at 12).

Spitler's version of those events is largely consistent with Ellis's testimony. Spitler testified that although Ellis appeared drunk, he was generally cooperating with the officers, responding to their questions and speaking at a normal volume. (Doc. No. 31-1 at 23-24). Like Ellis, Spitler testified that when the officers informed Ellis he was under arrest, Ellis replied they could arrest him, but asked they cuff him in the front because he was disabled and had an injured back. (*Id.* at 24). Spitler also testified he: encouraged Ellis to comply with the officers; told the officers Ellis was on permanent disability after Ellis made his request, and heard Ellis tell the officers his shoulders would not rotate back far enough for his hands to be handcuffed behind his back. (*Id.* at 24-25, 34). Regarding the takedown itself, Spitler said "[t]hey didn't take him to a knee or anything like that. They just – both guys on the side just kind of like drove him down, and then the guy in the back got his legs." (*Id.* at 26). Spitler confirmed it was not until Ellis was taken down and handcuffed that Ellis began cursing at the officers and acting belligerent. (*Id.* at 25-26).

Spitler's and Ellis's stories do diverge when it comes to what happened after the officers lifted Ellis off the ground. While both testified the officers assisted Ellis to the edge of the driveway, with Ellis yelling that his leg was hurting, (Doc. No. 31-1 at 29-30; Doc. No. 34-1 at 12, 15), Spitler said Ellis was eventually placed in a police vehicle, (Doc. No. 31-1 at 31, 33), while Ellis testified he waited by the vehicle until the ambulance arrived. (Doc. No. 34-1 at 15-16). Ellis admitted it was possible he was placed in the cruiser and taken to the police station, but forgot that

4

portion of the day's events because he hit his head when he was taken down by the officers. (Doc. No. 34-1 at 16).

Defendants paint a dramatically different picture of their interaction with Ellis. Simon testified Ellis's speech was slurred, his eyes were glassy and bloodshot, and he had alcohol on his breath. (Doc. No. 30-1 at 18). Simon also claimed Ellis mentioned being kicked out of a bar earlier that day. (*Id*.). Timm testified Ellis appeared intoxicated and "obviously upset." (Doc. No. 32-1 at 6). Timm also testified that Ellis was "argumentative" with the officers the entire time they were questioning him and called them a number of derogatory and vulgar names. (*Id*.). Miller testified that although Ellis responded to the officers' questions, he was generally uncooperative and a little belligerent. (Doc. No. 33-1 at 27-28).

Simon and Timm testified Ellis refused to submit to a field sobriety test. (Doc. No. 30-1 at 21-22; Doc. No. 32-1 at 6-7). After approximately five to fifteen minutes passed, Timm informed Ellis he was being arrested for operating a vehicle while under the influence. (Doc. No. 30-1 at 30; Doc. No. 32-1 at 7). While the officers' stories vary somewhat, the common thread running throughout their testimony is that Ellis was difficult toward the officers and resisted being placed under arrest.[4]

To counter this alleged resistance, Simon and Timm each took hold of one of Ellis's arms and attempted to place them behind his back. During this struggle, Ellis fell to his knees, though the

---

[4] Simon testified that after Ellis was told he was being placed under arrest, he began yelling and refused the officers' requests to put his hands behind his back. (Doc. No. 30-1 at 29-30). According to Simon, there were times Ellis was just screaming, but not saying anything in particular, and then other times Ellis was calling the officers derogatory names. (*Id.* at 30). Timm testified Ellis stood against his vehicle with head down, which, in conjunction with Ellis's argumentative tone leading up to that moment, led Timm to believe Ellis was resisting arrest. (Doc. No. 32-1 at 7). According to Timm, this is what led Defendants to go "hands on" in their arrest, and force Ellis's hands behind his back. (*Id.* at 7-8). Miller testified Ellis actively resisted by: not responding to the officers' verbal commands; balling up his fists and resisting the officers efforts to put his hands behind his back; and yelling, screaming, and making noise at the officers. (Doc. No. 33-1 at 32-35).

officers all claim he was not forced into this position. (Doc. No. 30-1 at 32; Doc. No. 32-1 at 9; Doc. No. 33-1 at 32). From there, the officers assisted Ellis by slowing his descent to the ground. (*Id.*). Once Ellis was lying prone on the ground, the officers handcuffed Ellis's arms behind his back. (*Id.*). Although Simon recalls Ellis mentioning he was disabled at some point that day, none of the Defendants recall Ellis asking to be handcuffed in the front because of his disability. (Doc. No. 30-1 at 26, 31; Doc. No. 32-1 at 9; Doc. No. 33-1 at 48).

Following this, the officers attempted to get Ellis to stand, but they faced additional resistance. This time, Ellis's alleged resistance came in the form of going limp and becoming dead weight, causing the officers to force him to stand against his will while he continued screaming at them. (Doc. No. 30-1 at 38-39; Doc. No. 32-1 at 10; Doc. No. 33-1 at 50). The officers all described walking Ellis to the police cruiser as a difficult process, wherein Ellis, who was still yelling at the officers but apparently not complaining of any pain in particular, would resist by stopping and refusing the officers' verbal commands to continue walking. (Doc. No. 30-1 at 41; Doc. No. 32-1 at 11; Doc. No. 33-1 at 52). Eventually, the officers got Ellis to a police cruiser, where he refused to get in because he said he would not fit. (Doc. No. 30-1 at 42; Doc. No. 32-1 at 11; Doc. No. 33-1 at 55). After briefly attempting to explain how to enter the vehicle in a manner that would allow him to fit, the officers were able to push Ellis into the police cruiser and take him to the police department for booking. (*Id.*).

Defendants claim that while Ellis was at the police station, he made several suicidal statements, which, along with the scrapes on Ellis's knees, caused the officers to call for a medical evaluation. (Doc. No. 30-1 at 45-46; Doc. No. 32-1 at 12-13). The medics decided to transport Ellis to St. Charles Hospital for a psychological inspection. While there, Ellis was diagnosed with acute alcohol intoxication and a fractured left ankle. (Doc. No. 29-1 at 1-3; Doc. No. 39-1 at 1-3).

6

Ellis claims that in addition to his broken ankle, he also suffered cuts to his chin and gums, a broken tooth, and cuts and bruises to his knees. (Doc. No. 39 at 2).

On January 31, 2018, Ellis filed suit under 42 U.S.C. § 1983 alleging the officers used excessive force during the course of his arrest in violation of the Fourth (and Fourteenth) Amendment. (Doc. No. 1). Ellis also brought various state law tort claims. (*Id.*). Defendants have moved for summary judgment on all of Ellis's claims.

### III. STANDARD

Summary judgment is appropriate if the movant demonstrates there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the nonmovant's favor. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). A factual dispute is genuine if a reasonable jury could resolve the dispute and return a verdict in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

### IV. DISCUSSION

#### A. Qualified Immunity

"Qualified immunity shields 'government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Estate of Hill by Hill v. Miracle*, 853 F.3d 306, 312 (6th Cir. 2017) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)) (further citation omitted). A court must answer two questions to determine whether a law-enforcement officer is entitled to qualified immunity on an excessive-force claim: "(1) whether the officer violated the plaintiff's constitutional

rights under the Fourth Amendment; and (2) whether that constitutional right was clearly established at the time of the incident." *Miracle*, 853 F.3d at 312 (quoting *Kent v. Oakland Cnty.*, 810 F.3d 384, 390 (6th Cir. 2016)). Although these questions can be answered in either order, *see Pearson*, 555 U.S. at 236, I begin with whether Defendants violated Ellis's constitutional rights under the Fourth Amendment.

### 1. Whether Defendants violated Ellis's constitutional rights

Ellis claims Defendants violated his Fourth Amendment rights by using excessive force to carry out his arrest. Following the Supreme Court's holding in *Graham v. Connor*, 490 U.S. 386 (1989), claims for excessive force during an arrest are analyzed under the Fourth Amendment's unreasonable seizure jurisprudence. *Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 400-01 (6th Cir. 2009) (citing *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001)).

"Whether an officer has exercised excessive force during the course of a seizure is determined under an 'objective reasonableness' standard." *Morrison*, 583 F.3d at 401 (citing *Kostrzewa*, 247 F.3d at 639. "This entails 'balanc[ing] the consequences to the individual against the government's interests in effectuating the seizure.'" *Morrison*, 583 F.3d at 401 (quoting *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002)).

While this fact-specific inquiry ultimately depends on the totality of the circumstances, courts rely on three factors identified by the *Graham* Court to guide the analysis: "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Reich v. City of Elizabethtown, Ky.*, 945 F.3d 968, 978 (6th Cir. 2019) (quoting *Graham*, 490 U.S. at 396).

When conducting this analysis, a court[5] must evaluate the lawfulness of the officer's conduct "from the 'perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Morrison*, 583 F.3d at 401 (quoting *Graham*, 490 U.S. at 396). Because the test is an objective one, the underlying motivations of the officer making the arrest are irrelevant. *Kostrzewa*, 247 F.3d at 639 (citing *Graham*, 490 U.S. at 397).

Finally, the Sixth Circuit has held excessive force claims must be analyzed in segments. *Reich*, 945 F.3d at 978. This means courts must focus "'on the "split-second judgment" made immediately before the officer used allegedly excessive force,' not on the poor planning or bad tactics that might have "created the circumstances" that led to the use of force." *Id.* (quoting *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 407 (6th Cir. 2007)) (further citation omitted).

### a. The severity of the crime at issue

The officers had probable cause to believe Ellis had been operating a vehicle while intoxicated.[6] *See Goodrich v. Everett*, 193 F. App'x 551, 555 (6th Cir. 2006) (determining the crime at issue by reference to the crime officers reasonably believed had been committed by the suspect they were placing under arrest). The Sixth Circuit's description of the severity of this crime has varied, but generally this crime is treated as moderately severe. *Marvin v. City of Taylor*, 509 F.3d 234, 245 (6th Cir. 2007) ("[d]runk driving is substantially more serious than the offense of trespassing . . ."); *Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 764, 774 (6th Cir. 2004) (describing driving while

---

[5] Although questions of reasonableness are often questions of fact left to the jury to decide, in this context it is for the court to determine—based on the facts viewed in the light most favorable to the plaintiff—whether the officers' actions were objectively reasonable under the circumstances. *See Marvin v. City of Taylor*, 509 F.3d 234, 246 n.6 (6th Cir. 2007) (citing *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007)).

[6] Prior to placing Ellis under arrest, the officers conducted an interview with Ellis and learned that he had been drinking before he drove himself home. And each of the officers, along with Spitler, testified to Ellis being noticeably drunk during his interactions with the officers. Therefore, it was reasonable for the officers to believe Ellis had committed the offense of operating a vehicle while intoxicated.

9

intoxicated as a crime that is "moderate in severity"); *Laury v. Rodriguez*, 659 F. App'x 837, 843 (6th Cir. 2016) (reasoning that operating a vehicle while intoxicated is not a severe offense that would support a greater use of force); *Eldridge v. City of Warren*, 533 F. App'x 529, 532 (6th Cir. 2013) (recognizing that, in situation where individual was no longer actively operating the vehicle, driving under the influence is "undoubtedly serious, but not categorically 'severe' nor 'severe' on this particular occasion.") Thus, Ellis was being arrested for what is, at most, a moderately severe crime.

Ellis admits driving while intoxicated is a serious offense, but correctly points out that by the time the officers interacted with him, he was no longer driving. (Doc. No. 39 at 8). While this does not change the severity of the offense—drunk driving does not cease to be a moderately severe crime simply because it has been completed—it does affect the weight the severity of the offense should be given when determining the appropriate level of force. To understand why, one must only consider why the severity of the crime at issue is relevant to the analysis in the first place.

The three factors identified in *Graham* are meant to help courts determine whether the force used to effect a seizure is reasonable under the Fourth Amendment, a question which depends on a careful balancing of the "'nature and qualify of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)) (further citation omitted). The severity of the crime at issue is relevant to this balancing because it speaks to the governmental interests at stake. But the severity of the crime does not, by itself, justify greater levels of force when the suspect is no longer in a position to continue the crime.

Here, the government had an interest in preventing Ellis from continuing to operate a vehicle while intoxicated, as well as interest in arresting and prosecuting Ellis for his earlier operation of a vehicle while intoxicated. But neither of these interests is advanced in any way by the level of force the officers used. This is similar to the way there is no legitimate government interest in the

use of force against a suspect who has already been incapacitated, regardless of the crime they committed, *see Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 608 (6th Cir. 2006) (collecting cases and stating "[c]ases in this circuit clearly establish the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest.") (quoting *Shreve v. Jessamine Cty. Fiscal Court*, 453 F.3d 681, 688 (6th Cir. 2006)). In both situations, the severity of the crime at issue is irrelevant because there is no risk of the suspect continuing to commit the crime or escaping prosecution for committing it in the first instance.

Under these circumstances, the moderate severity of the crime Ellis was suspected of committing does not, on its own, provide any support for the force Ellis alleged was used.[7]

**b. Whether Ellis posed an immediate threat to the safety of the officers or others**

Defendants contend Ellis's size[8] and inebriated condition made him a threat to the officers and others.[9] (Doc. No. 29 at 9).

On the intoxication front, Defendants rely primarily on the Sixth Circuit's holding in *Marvin v. City of Taylor*, a case which also involved an excessive-force claim brought by an individual who asked to be handcuffed with his arms in front during his arrest by law enforcement for drunk driving. *Marvin*, 509 F.3d at 238. There, the court reasoned that the plaintiff's intoxicated state might render a decision to deny his request to have his arms handcuffed in front of him objectively

---

[7] Of course, Ellis's intoxication is still relevant to the analysis. But his operating a vehicle while intoxicated, as opposed to, for example, jaywalking while intoxicated, does not make it any more reasonable for the officers to use the level of force alleged.

[8] At the time, Ellis was approximately six feet, three inches tall, and he weighed around 360 pounds. (Doc. No. 34-1 at 20).

[9] They also argue Ellis's belligerent manner contributed to a volatile situation exacerbated by Ellis's 115-pound dog "going crazy" in his backyard. (*Id.* at 9-10). But Ellis and Spitler both testified Ellis cooperated with the officers and did not act hostile towards them until after they took him to the ground. (Doc. No. 31-1 at 25-26; Doc. No. 34-1 at 15-16). Thus, for the purposes of deciding Defendants' motion, I must conclude Ellis was not acting belligerent. As for Ellis's dog, it remained in an enclosed portion of the property—separated from the officers—throughout their encounter with Ellis. It posed no threat to the officers, and I see no way in which its barking could have justified using a greater level of force against Ellis.

reasonable. *Marvin*, 509 F.3d at 246 ("Drunk persons are generally unpredictable and Marvin's unpredictability created a situation where it was not objectively unreasonable for the Defendants to take the extra precaution of handcuffing Marvin behind his back rather than in front."). But the court specifically recognized that the arrestee's intoxicated state did not necessarily mean the officers were justified in using the level of force that the plaintiff alleged they had. *Id.*; *see also Stanfield v. City of Lima*, 727 F. App'x 841, 846 (6th Cir. 2018) ("However, 'while heavy intoxication may, on its own, render it reasonable to handcuff an individual, the reasonableness of the force used to effectuate the seizure. . . will generally depend upon other circumstances, such as the individual's *resistance* and *hostility*.'") (quoting *Solovy v. Morabito*, 375 F. App'x 521, 525 n.4 (6th Cir. 2016)) (further citation omitted).

Thus, under *Marvin*, it might have been reasonable for the officers to refuse Ellis's request in the name of officer safety, but this does not mean it was reasonable to respond to his request by forcing him to the ground. His intoxication was merely one of many factors for the officers to consider. *See Stanfield*, 727 F. App'x at 847 (holding a reasonable officer would not have concluded an individual was a materially greater threat than a non-intoxicated person where individual had an "argumentative demeanor" but did not act threatening or hostile to officers in any way).

For similar reasons, Defendants' contention that Ellis's size justified a greater level of force is also unavailing. No matter Ellis's size, the operative facts provide no support for concluding the officers could have reasonably perceived Ellis to be such a threat to their safety that they had to immediately incapacitate him by using a forceful takedown. Even when coupled with his intoxication, Ellis's physical characteristics do not make it reasonable for three officers to tackle him to the ground under these circumstances.

Thus, the second factor weighs against finding the Defendants' use of force reasonable.

12

### c. Whether Ellis was actively resisting or attempting to evade arrest by flight

Defendants argue Ellis was actively resisting arrest because he refused the officers' commands to turn around and place his hands behind his back.[10] (Doc. No. 29 at 10). But the Sixth Circuit has drawn a distinction between "active resistance" and "passive resistance." *See Rudlaff v. Gillispie*, 791 F.3d 638, 641-42 (6th Cir. 2015) (examining cases and concluding that police can use greater levels of force against a person actively resisting arrest). Therefore, even if the officers issued these commands before they took Ellis down, the question is whether Ellis's failure to immediately place his hands behind his back, coupled with his request that the officers cuff his hands in front of him, constitutes the active resistance necessary to justify a greater level of force.

"Active resistance includes 'physically struggling with, threatening, or disobeying officers.'" *Id.* (quoting *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495 (6th Cir. 2012)). It also includes an individual refusing to move their hands for the police to handcuff them, provided that the individual's inaction is coupled with other, more deliberate, acts of defiance. *Rudlaff*, 791 F.3d at 641; *see also Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015) ("Such resistance can take the form of 'verbal hostility' or 'a deliberate act of defiance.'") (further citation omitted). But a refusal to follow an officer's order does not, by itself, constitute a deliberate act of defiance. *See Goodwin*, 781 F.3d at 323-24; *see also Eldridge*, 533 F. App'x at 533-34 ("In cases where we concluded that an officer's use of force was justifiable because it was in response to active resistance, some outward manifestation—either verbal or physical—on the part of the suspect had suggested volitional and conscious defiance[.]"). Thus, if an individual does nothing more than refuse to move

---

[10] They also contend that Ellis resisted through "repeated expressions of profanity, screaming, making his body limp, refusals to rise, and refusals to walk to the cruiser," (Doc. No. 29 at 10). But a reasonable jury could find none of these things occurred prior to the officers performing the takedown, making these acts by Ellis irrelevant to whether it was reasonable for the officers to perform the takedown in the first place. For this reason, the analysis here is limited to Ellis resisting by not placing his hands behind his back when he was told he was under arrest.

13

their hands into position for police to handcuff them, the individual has not engaged in active resistance. *Rudlaff*, 791 F.3d at 641-42 (citing *Eldridge*, 533 F. App'x at 535).

Viewing the facts in the light most favorable to Ellis, he was engaged in only passive resistance to the officers' orders. Ellis and Spitler both testified Ellis did not act verbally or physically hostile towards the officers at any point before they took him to the ground. (Doc. No. 31-1 at 24; Doc. No. 34-1 at 12). Although Ellis was not completely cooperative—he refused to take the field sobriety tests and he asked for his hands to be handcuffed in front—he was not engaged in the kind of resistance that would justify a greater level of force.

Thus, the third factor weighs against finding the Defendants' use of force was objectively reasonable.

### d.  Whether the totality of the circumstances justifies the use of force

"The final step in the *Graham* analysis requires the court to inquire 'whether the totality of the circumstances justifie[s] a particular sort of … seizure.'" *Goodwin*, 781 F.3d at 324 (quoting *Graham*, 490 U.S. at 396.

On this point, Defendants contend Ellis's general demeanor is "[t]he factor permeating all the others" and argue this demeanor made it reasonable for them to immobilize him by handcuffing his arms behind his back. (Doc. No. 29 at 10-11). But Ellis's demeanor is another one of the facts in dispute. Again, testimony offered by both Ellis and Spitler contradicts the Defendants' claims that Ellis was belligerent with the officers before being cuffed. This distinguishes the present case from the situation in *Marvin*, where it was undisputed that the heavily intoxicated plaintiff's behavior was highly volatile. *See Marvin,* 509 F.3d at 24.

Viewing the facts in the light most favorable to Ellis, I find none of the factors support the level of force the officers used, and I conclude the officers acted in an objectively unreasonable

manner when they took Ellis to the ground shortly after he asked them to handcuff his arms in front of him.

### 2. Whether Defendants violated a clearly established right

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019) (*per curiam*) (further citation omitted). "A right is clearly established if '[t]he contours of that right [are] sufficiently clear that a reasonable official would understand that what he is doing violates the right.'" *Goodwin*, 781 F.3d at 325 (quoting *Wheeler v. City of Lansing*, 660 F.3d 931, 938 (6th Cir. 2011)); *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Ellis argues there was clearly established law because "the law is replete with Fourth Amendment holdings that warn about excessive force in search and seizures." (Doc. No. 39 at 10). In response, Defendants, relying primarily on *Emmons*, contend that summary judgment is appropriate because Ellis fails to "identify a Supreme Court or Sixth Circuit case in which an officer acting under similar circumstances was held to have violated the Fourth Amendment." (Doc. No. 40 at 6). Neither of these arguments are faithful to the doctrine of qualified immunity.

To Defendants' credit, it is not enough that the law is "replete with Fourth Amendment holdings" warning that excessive force is unconstitutional. *See Emmons*, 139 S.Ct. at 503 ("[The Supreme Court] has repeatedly told courts … not to define clearly established law at a high level of generality.) (quoting *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018)); *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001) ("[E]ven though *Graham v. Connor* []clearly established the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness," that is not enough because the right must be clearly established in a more particularized sense). Thus, Ellis cannot rely on the general right to be free from excessive force;

instead there must be some more specific right—one that was clearly established as of February 24, 2017—that Defendants' alleged actions would have violated.

But here Defendants' argument stretches too far. Nowhere in the doctrine of qualified immunity is there anything requiring plaintiffs to identify some factually analogous case to defeat summary judgment. To support their claim that Ellis must "identify a case in which officers were held to have violated the Fourth Amendment by utilizing a takedown maneuver and handcuffing an acutely intoxicated, resistant and confrontational subject behind the back who had engaged in conduct endangering the public,"[11] Defendants cite the following passage from the Supreme Court:

> [W]e have stressed the need to identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment.... While there does not have to be a case directly on point, existing precedent must have placed the lawfulness of the particular [action] beyond debate.... Of course, there can be the rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances.... But a body of relevant case law is usually necessary to clearly establish the answer...."

(Doc. No. 40 at 5-6); *Emmons*, 139 S. Ct. at 503 (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 581 (2018)).

There are two problems with Defendants' argument. First, there is no requirement that the plaintiff identify with precision the clearly established law in their briefing; and second, the clearly established law does not always have to come from a case with facts as similar as the Defendants' argument would require.

First, Defendants provide no support for the position that, in a case where the plaintiff seeks to overcome the defense of qualified immunity, the plaintiff must be the one to identify the clearly established law that puts the defendant on notice. When the Supreme Court said "we have stressed the need to identify a case where an officer acting under similar circumstances … was held to have

---

[11] Again, whether Ellis was "resistant and confrontational" is a question of fact. Because there is credible evidence to the contrary, I must conclude, for the purposes of deciding this motion, that he was not.

16

violated the Fourth Amendment[,]" it was quoting from a prior case, in which it was admonishing the panel that issued the opinion the Supreme Court was reviewing, not the plaintiff that brought the case. *Wesby*, 138 S. Ct. at 577; *White v. Pauly*, 137 S. Ct. 548, 552 (2017) ("The panel majority misunderstood the "clearly established" analysis: It failed to identify a case where an officer acting under similar circumstances as Officer White was held to have violated the Fourth Amendment."). It is the court, not the plaintiff, that must identify the clearly established law which put the defendants on notice. Of course, it will be in the plaintiff's interest to direct the court's attention to such cases, but nothing in the rationale of qualified immunity supports requiring the plaintiff to do so.[12]

Second, in the very portion of *Emmons* on which Defendants rely, the Supreme Court explicitly recognized the possibility of the "rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Emmons*, 139 S. Ct. at 504. And both the Sixth Circuit and Supreme Court have consistently held that "[t]here need not be a case with the exact same fact pattern, or even 'fundamentally similar' or 'materially similar' facts; rather, the question is whether the defendants had 'fair warning' that their actions were unconstitutional." *Goodwin*, 781 F.3d at 325 (quoting *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005); *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). As I will explain below, the law was clearly established, and the defendants were put on notice, even though Ellis has not identified a case with fundamentally similar facts.

---

[12] While the doctrine of qualified immunity does emphasize the importance of giving fair notice to defendants, *see Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam), this interest is served by asking whether the law is clearly established, not by requiring the plaintiff to later cite in court the cases that put the defendant on notice at the time the defendant violated the plaintiff's constitutional rights. If the law was clearly established at the time the defendant acted, then qualified immunity should not apply—this is true whether or not the plaintiff is able to later identify the exact cases that made the law so.

17

I begin by defining the clearly established right with specificity. Ellis had the right to be free from being forcefully taken to the ground by multiple officers when: (1) he was suspected of having operated a vehicle while intoxicated prior to his contact with the police, a moderately severe crime for these purposes; (2) there was no reason for the officers to believe Ellis posed a threat to the safety of the officers or others; and, (3) Ellis engaged in only passive resistance, refusing to perform certain field sobriety tests and requesting that the officers handcuff his arms in front of him.

Perhaps most analogous to the present case is *McCaig v. Raber*, 515 F. App'x 551, (6th Cir. 2013), where the court denied qualified immunity because it held that an officer performing a takedown on an individual who was, at most, passively resisting arrest, violated the individual's clearly established rights. The court held this even though the officer actually saw the suspect hit someone and thus, unlike the Defendants in the present case, had some reason to believe the suspect might pose a threat to officer safety or the safety of others. Further, the court's discussion of Sixth Circuit precedent demonstrates there is a "body of relevant case law," *Emmons*, 139 S. Ct. at 503, that clearly establishes that the officer violated the suspect's constitutional rights:

> [C]ases in this circuit clearly establish the right of [persons] who pose no safety risk to the police to be free from gratuitous violence during arrest." *Baker v. City of Hamilton, Ohio,* 471 F.3d 601, 608 (6th Cir. 2006) (quoting *Shreve v. Jessamine Cnty. Fiscal Court,* 453 F.3d 681, 688 (6th Cir. 2006)); *see also Champion v. Outlook Nashville, Inc.,* 380 F.3d 893, 902 (6th Cir. 2004) ("We have ... consistently held that various types of force applied after the subduing of a suspect are unreasonable and a violation of a clearly established right."). Moreover, this court's prior opinions "clearly establish that it is unreasonable to use significant force on a restrained subject, even if some level of passive resistance is presented." *Meirthew v. Amore,* 417 Fed.Appx. 494, 499 (6th Cir. 2011) (citing *Griffith v. Coburn,* 473 F.3d 650, 659 (6th Cir. 2007) (holding that when a suspect refuses to follow officer orders, but otherwise poses no safety threat, use of significant force is unreasonable)); *Baker*, 471 F.3d at 607–08 (use of force on a plaintiff that was "unarmed, was compliant, and was not a significant threat" violated clearly established law); *Lustig v. Mondeau*, 211 Fed.Appx. 364, 369–71 (6th Cir. 2006) (gratuitously causing pain to a "nonviolent and, at most, passively resistant detainee" violated clearly established law).

*McCaig*, 515 F. App'x at 555-56. Although the court in *McCaig* did not address whether the officer in that case had reason to believe the plaintiff was intoxicated, Ellis's apparent

18

intoxication in the present case does not change the outcome. *See Lustig*, 211 F. App'x at 369-71 (denying qualified immunity on excessive-force claim where plaintiff was intoxicated but engaged in only passive resistance).

Viewing the facts in the light most favorable to Ellis, the defendants violated clearly established law when they performed the takedown of Ellis. Thus, the defendants are not entitled to qualified immunity.

### B. State Law Claims

Defendants also moved for summary judgment on Ellis's state-law claims. Ellis's complaint includes state-law claims for both negligence and gross negligence, as well as a claim for damages from criminal acts under Ohio Rev. Code § 2307.60.[13] Defendants contend they are entitled to immunity on these claims under Ohio Rev. Code § 2744.03, which provides immunity for employees of political subdivisions unless, among other exceptions, the employee's "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless matter." Ohio Rev. Code § 2744.03 (A)(6)(b). In Ohio, "malicious purpose" is defined as "the willful and intentional design to do injury, or the intention or desire to harm another, usually seriously, through conduct that is unlawful or unjustified." *Caruso v. State*, 737 N.E.2d 563, 567 (Ohio 2000).

A reasonable jury could find, based on the facts viewed in the light most favorable to Ellis, that Defendants acted with an intention or desire to do harm to Ellis, through conduct that was unlawful or unjustified. Thus, Defendants are not entitled to summary judgment on Ellis's state-law claims.

---

[13] Defendants' motion for summary judgment sought dismissal of claims for assault, menacing, and interfering with civil rights, but as a technical matter, no such claims exist. Instead, Ellis's complaint brought a claim under Ohio Rev. Code § 2307.60, which authorizes a general civil cause of action for damages from criminal acts. *Jacobson v. Kaforey*, 39 N.E.3d 799, 806 (Ohio Ct. App. 2015). And in support of that claim, Ellis alleges the criminal acts he suffered damages from include assault, menacing, and interfering with civil rights.

## V. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is denied.

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge
